The final case for argument this morning is 23-1953, Purdue Pharma v. Accord Healthcare. We begin at the end of a long morning. It's no longer existent anymore. Thank you, Your Honors, and may it please the Court. The District Court invalidated, for obviousness, two sets of patents claiming innovative solutions to problems with the original formulation of OxyContin. I'd like to focus today with three primary flaws with that decision. First, the District Court glossed over admitted gaps in the prior art by invoking the obvious-to-deprive principle, even though it failed to find the basis for invoking that principle, a finite set of predictable solutions. And even though Accord's own expert testified that heating PEO above its melting point without compression could result in a puddle, the very opposite of what an innovative solution would have called for. Second, even putting aside that error, there are overwhelming indications of non-obviousness in this case. OxyContin was a billion-dollar drug that faced an existential threat stemming from abuse. Everyone knew this, and everyone tried to develop an abuse-resistant tablet for extended-release OxyCodone. There was no legal bar, no existing monopoly, as the District Court seemed to believe, to the development of an abuse-deterrent patent. And if anyone else had done that, I don't think we would be here today talking about whether or not that was obvious. But Purdue succeeded after many others failed, and I think that that story, those facts, make it impossible to find that this was all obvious to begin with. And third, with respect to the low ABOC patents, Purdue did exactly what this Court and the District Court in the prior Epic case said it could do to avoid a finding of obviousness. It tailored its claims to the removal of 8-alpha rather than the end product, an OxyCodone with low 14-hydroxy levels. In other words, Purdue claimed the discovery of 8-alpha itself, something that the District Court in this case found was a surprisingly important component to the solution. In those circumstances, the low ABOC patents could not be obvious either. For those reasons, the District Court should reverse. I'd like to go back and begin with the abuse-deterrent patents and the problem with the invocation of the obvious-to-try principle. Now, this was a narrow principle that the Supreme Court and this Court has acknowledged to overcome gaps in the prior art. But it's narrow because it has to be. If you engage in hindsight, it can always be clear with hindsight that it's obvious to try something. But this Court and the Supreme Court have repeatedly said, you have to find a situation in which there's a finite set of easably traversable options. Let me just ask you this. So one of the ways that the obvious-to-try path is sometimes invoked is as a kind of substitute for proving in the ordinary way a motivation to go down a particular path. And that's what makes it maybe a little bit fraught with danger. So you have to have only a few possibilities and you have to kind of know what the result is going to be. And then you say, all right, they're all obvious. But we don't really have a situation where there's lacking an independently proved motivation to go down this path. Even in your description, if you want to try to solve this OxyContin abuse problem, you can make it smell or taste bad. You can add something to get rid of the high that motivates people to want to abuse it. Or you can make it less liquefiable and therefore injectable or less sniffable or something like that. All of which are obvious possibilities. And we certainly have lots of case law over, you know, decades that say, you don't assume that the skilled artisan has to pick just one of them. As long as this is one of the things a skilled artisan would do, step down the path of making it harder or whatever it is. And then the rest of the story flows here without having to do this obviousness to try. Just continue to address that little story I told. Sure, Your Honor. I mean, first, I think it's clear that Judge Andrews invoked obvious to try here. So if it was error for him to even invoke it, then he should go back and perform the correct analysis. But second, I think what Judge Andrews did is he admitted that there were gaps in the prior art as to both the curing limitation and the time and temperature limitation. And he had to overcome those gaps. And so he invoked the principle of obvious to try to say that, well, you had ovens, and it would be obvious to try ovens. But he did so without finding that there were a finite set of predictable solutions here. And just to take the predictability part of it, which is really important, this wasn't predictable at all. No one had ever used an oven to heat PO before in the prior art. No one had ever used an oven to heat any polymer in the prior art above its melting point. And Purdue's own expert at page 5265 of the appendix here acknowledged that heating PO above its melting point could cause it to puddle. So there's no reason to think it was predictable to heat PO above its melting point without compression. In fact, as its expert acknowledged, the belief was that that would result in a puddle. So to invoke the obvious to try principle in that case to overcome those gaps in the art is really to just drive a hole through the obviousness analysis. And as you rightly indicated, Your Honor, the reason why there are constraints on that principle is to avoid the trap of hindsight. Same with the objective indications that maybe we can talk about a little bit later. And here, the district court's analysis is written with hindsight throughout, as was a court's case. I mean, the trial, the expert was asked, well, there are various ways you could do it. And she said, well, one way you could do it is this way. Well, you can always say that in hindsight. And this is really important because, again, if you just take a step back and look at the big picture here, OxyContin was a billion-dollar drug. It faced an existential threat to the point that the FDA was threatening to withdraw it from the market and eventually did withdraw it from the market. Many people around the world tried to develop a solution for this, recognizing that if they did so, there was a jackpot at the end of the rainbow. And people tried and failed. Grumenthal, who – When you say many, tell me if I'm wrong. I think I'm remembering that your evidence on this, at least in the district court opinion, is about two triers. So there was Accord. There was Grumenthal. There was the Okana product. There's certainly – Is Okana Grumenthal product? Okana was – I think it was Endo product, Your Honor. Oh, okay. So there were others. There were others that were trying and failing. Purdue itself spent hundreds of millions of dollars in nearly a decade on this effort. Grumenthal had the benefit of the Bartholomews reference, and the testimony was that he had 400 different formulations, 900 batches, and he couldn't do it. And, of course, the way that Bartholomews did it was he went to the trouble of building this contraption in which he put a heating – a tablet press inside of a heating cabinet and did it that way. But the invention, the ingenuity here was that you could heat PEO above its melting point without compression and achieve this abuse-resistant tablet that no one did before. And with respect, I don't think we would be here today if another company had done that and established the abuse-resistant tablet, gone on the market with it, and taken over the market, particularly after FDA withdrew the approval for the original oxycodone because of the problems with abuse. That would be clear. And I think what this boils down to on the secondary edition is really commercial success. Purdue's expert acknowledged, in her words, that there was definitely a long-felt but unmet need for this product. Accord's experts acknowledged that sales would have been lower without the abuse-deterrent properties. The district court attributed commercial success, and maybe just in passing, but with a statement that Purdue had a monopoly in this area. And for that reason, apparently, you cannot argue commercial success. Can you respond to that? Yes, Your Honor. And that was absolutely incorrect, and I don't even think my friends really defend that. They try to say monopoly meant something else. Existing monopoly is used to refer to typically – Can it mean just it had market control here or it had a substantial stake in the market here historically? That's certainly not the way we – I think monopoly is a legal word. If a judge is using that one, we tend to think that it has absolute control. Here, there were other players that eventually entered the market for the extended release. And I don't think that that – even if you looked at it that way, Judge Prost, that that would solve the commercial success issue because this was an existential threat to OxyContin. FDA threatened to remove it from the market and did remove it from the market. Anyone – there was no – OxyContin was off patent. Anyone could have developed – You had an expert on this, right? Excuse me, Your Honor. You brought in an expert on commercial success, and as I recall the record, he noted that all sales of the original formulation were transferred to the new formulation. And also, he didn't specifically consider the claim features in assessing commercial success. Don't you need that to establish commercial success? I don't think you would here, Your Honor, because this would – if we hadn't developed – without the abuse deterrent patent, we couldn't have gone forward with the original formulation of OxyContin. All the sales would have been lost. And I think – I'd be happy to go through the evidence on this. I mean, first, a court's own expert acknowledged that sales would have been lower without the abuse deterrent tablet. That's at 5993 of the appendix. Second, a survey of prescribers showed that abuse deterrent was, quote, one of the highest unmet needs in the market. That's at 5374. The prescribers also – the survey also showed that abuse deterrent was one of the most important data that they reviewed. That's at 5376. Producing marketing materials were focused on the scientific data about abuse deterrents at 539697. And there was evidence that there were other players in the market. This was all the kind of evidence that this court has looked to in the past. It looked to in the Apple case. The court found that the slide lock feature was important to commercial success, and this overcame a claim of obviousness. And I know that everybody didn't agree with that, but this case is worlds removed from a slide lock feature. This is about the ability to bring an extended release oxycodone to market in the face of a grave public threat crisis that was an existential threat to this drug. Can you remind me, once Purdue had this – this may be so obvious, but it went to the FDA and got approval to market it?  Initially, the FDA expressed skepticism about it. It studied it further and eventually got the label for abuse deterrent. And then the initial approval was – On a regular old new drug application or some modification of the earlier? It was on the – I believe it was on the original application. Just studied it further and eventually granted the approval for the abuse deterrent formulation. Was that a – I don't know, a process that was streamlined in a way that was unique to Purdue having the original? I don't believe so, Your Honor. So anybody else could have gotten onto the market as fast as – the abuse deterrent product as Purdue? I believe so, Your Honor. And the FDA studied it for three years before approving it. And was there evidence about Purdue's established distribution channels or anything like that that would indicate that even though there was no legal barrier to competition, that in the period where commercial success was being measured, Purdue's old monopoly, just in an economic sense, was a force for the massive success of Purdue's version of this? Well, so first of all, the abuse-resistant tablet was the reformulated OxyContin, which only had two of the same ingredients as the initial OxyContin. It was an NDA, Your Honor. It was a new drug application. It was. It was. Okay, that's it. And on the existing channels, I mean, because – I mean, we don't deny that, of course, Purdue was in the marketplace here, but this was an existential threat. If someone had come in, developed an abuse deterrent form of an extended-release OxyContin, as others did, I mean, others eventually entered the market. Every time you say existential threat, I try to translate that into why that should matter and I'm having a hard time doing it. I keep focusing on how Purdue sold a lot of this. Others didn't, and I read the district court's use of the term monopoly to mean, well, you know, the monopoly firm, not legally protected, just it has all of the outlets in the country or something. Well, of course it's going to have a lot of sales. That doesn't tell you very much about whether it was non-obvious, and I'm trying to understand whether this is anything like that. So I think what my point is that without the development of this patent, sales would have gone to zero. And so it's true that Purdue had, you know, sales, significant sales beforehand, but this was existential in the threat that without the development of this, they would have been pulled from the market, and FDA did pull the original OxyContin from the market. The success was due to FDA approval. Because of the development of an abuse deterrent formulation, Your Honor. And again, others did enter the market. There was testimony, there was robust entry and exit in the extended release OxyContin market. This is at page 592, 5392 of the appendix. By 2021, there were six other extended release OxyContin with abuse deterrent features in the market. The point is that Purdue's standard release is not one of the claim limitation. Not the ones at issue here. That's correct. And the point is that anyone else could have developed this, and if they had to be the first to go to market with this abuse deterrent feature, I don't think there's any basis to question that they would have been extremely financially successful, given the benefits of this drug when used properly. I fully appreciate the abuse deterrent factor and the role that that plays in this case, but I think you rely on this too broadly. I'm like Judge Tront, I'm having a hard time fitting into the equation of this case, your terminology on abuse deterrents. I think every patent is important. Every patent is a new discovery, and there are some that are simple discoveries that have great consequences. I don't know that we have a way of judging the oh, wow type factor of a new patent. And even if we did, I don't see where you have anchored that to any claim limitation. So, Your Honor, I think what the secondary indicia are looking at is sort of common sense, this is the way they described it in the Apple case, factors that would sort of undermine the conclusion this was all obvious all along. And here I think you have a compelling record for that, because you have a billion dollar product, you have a grave threat to that product, a race trying to develop a solution to that, and it took many years, nearly a decade for someone to do it, after hundreds of millions of dollars of investment. I mean, all of that shows powerfully that this wasn't and couldn't have been obvious all along, or somebody would have done it. And I think that that's the central teaching of this Court's cases, and I don't think it's hard to imagine a more powerful factual context for that. I do want to address the lower... We're out of time. Okay. You were going to progress on your briefs. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I want to address the two issues that my friend on the other side addressed. First, that it was allegedly error to rely on obvious-to-try. The District Court did not rest its findings on an obvious-to-try. There's a single mention of obvious-to-try, that's at Appendix 13. The District Court said, at the very least, in the absence of testimony about other heating tools, it would have been obvious-to-try an oven. But as Judge Toronto noted, the obvious-to-try analysis is really when there's no explicit motivation. Here there was a clear motivation to use ovens. Judge Andrews relied on the unrebutted evidence from Dr. Appell that the Bartholomews mechanism in its examples was not scalable, while ovens were understood to be scalable and commonly used in pharmaceutical manufacturing. So there was a clear motivation to combine, which they have not challenged as being clearly erroneous. So why didn't this happen earlier? Your Honor, I think the key thing here is the chronology. The Bartholomews reference, which is the basis of our obviousness, was published in February of 2005. Perdue then visited Grunenthal, learned about the technology from Bartholomews, and within a year filed the application here, doing the simple and obvious modification that we proposed of taking Bartholomews' teaching of heating PEO to make a tamper-resistant tablet. Bartholomews suggested it can be done subsequently. Perdue simply did so using ovens and pancoaters. The record showed that those were commonly used in pharmaceutical facilities. There would have been a clear reason to use them. So the period of time for assessing failure of others, or even perhaps commercial success during a particular time, but at least failure of others, is the period of time that starts with the crucial prior art. I believe that's correct, Your Honor, in terms of a long-felt but unmet need. The need here was met by Bartholomews. Bartholomews provided the solution to the crushing problem, the abuse of OxyContin, make hardened tablets, and it taught how to do that, heat PEO and make the tablets. So I think that's absolutely the time frame, Your Honor, because the question here is not what would have been... Do we have any case law that says something like what I just said? I vaguely think yes, but I'm not summoning up a name. Is that wrong? I mean, it makes a kind of logical sense, perhaps, but is there some authority for that idea that it may have taken a very long time when it was not obvious to anybody to get to a piece of prior art, but once that was in place, hardly any time elapsed before the now subject-to-challenge invention came about. I can't speak to a specific case, Your Honor, but certainly in terms of the long-felt need doctrine, there is the second part of that, the long-felt but unmet need. So it certainly would be sort of nonsensical if a party could say, you know, long-felt need shows the non-obviousness of our claims, even though actually this came about in the prior arts a year earlier. What about commercial success? Yes, Your Honor. I think the district court correctly addressed commercial success here because it noted that the demand was simply the demand for OxyContin. Both experts agreed that the sales simply transferred from original OxyContin. But why should that matter? Because we're not looking at the original OxyContin. We're talking about this new anti-resistance. So why don't they get credit for it just because there was a transfer of sales? Assuming people could no longer get the first kind, it doesn't mean necessarily that they would be transferred to the same maker, to Purdue. Yes, Your Honor, but I think it rebuts the presumption that the commercial success is due to the merits of the claimed invention. There was clearly demand for OxyContin, for oxycodone, and then they failed to tie that success to anything that is novel in this patent over Bartholomew's. So your answer to commercial success is it's the same people that would have bought the other drug. They didn't care about the anti-crushing. It's just the FDA that cared about it, and therefore they don't get entitled to commercial success. Well, I think it's two things, Your Honor. First, I think the record shows that people were buying OxyContin, regardless of whether it was reformulated. So certainly people were buying it in the industry. But I think the key point here is it has to show non-obviousness over Bartholomew's. And so what is driving the sales has to not only be claimed in the patent, but be novel over what's in the prior art. So even if we say, yes, the abuse deterrent feature was driving sales, that's exactly what's taught in Bartholomew's. Bartholomew's teaches forming the hardened tablet. It teaches forming the tablet that gels and is therefore resistant to syringability. So their expert admitted he hadn't even attempted to tie the sales of commercial success to anything in the specific claims here, which, as Judge Reina noted, do not even claim any abuse deterrent features. There's no claim language relating to hardness or syringability. But regardless, those were taught in Bartholomew's. Can I take you back to where you began about obvious to try? Let's assume – I heard you quote the sentence that the district court didn't necessarily rely on that. Let's assume that we read his opinion as relying on an obvious to try. Is your argument that you two are each talking about different problems to be solved and that's where there's this disparity in the arguments for obvious to try, in terms of whether there's a finite number of solutions? Yes, Your Honor. I think the key point is, again, they're ignoring Bartholomew's. They're saying, well, if you ignore everything and we go back to, say, 2000, there would have been lots of avenues a person still could have investigated. But the question here is, viewing Bartholomew's, Bartholomew's teaching the heated PEO tablet and suggesting that subsequent heating can be used, what are the options for subsequent heating? And there were three, which Dr. Appel testified to, ovens, pan coaters, and fluid beds. And the district court noted this in Appendix 13, that Purdue had not argued there was any other natural choice for heating at a scalable way. Purdue had not argued, you know, that there was any sort of infinite options. There were three, which is certainly quite finite, Your Honor. And I wanted to briefly touch on the repeated arguments that everyone was trying and failing to do this. There's simply no evidence in the record of this, Your Honor. The only two alleged failures were first accord. And I want to be clear about what happened in that case, Your Honor, is that accord was simply taking a different formulation, which was made by DeVelco, which was a drug-coated pellet. And that was perfectly successful when DeVelco did it on a particular coating pan. They transferred it to a different facility and they didn't get the dissolution profile they were hoping for because the angle of the coating pan, the coating spray, was different. It had nothing to do with the issues we're talking about in this case, in terms of making a drug abuse deterrent, in terms of modifying Bartholomews to heat at scale. The only other alleged failure was Opana. As we cited in the record, Opana is a different drug. It's oxymorphone. It's a more potent drug. And there's no evidence in the record about how Opana was made, about how its abuse deterrent features related or differed from that of reformulated OxyContin. So all we know is simply that the FDA made the determination that the benefits of Opana being on the market did not outweigh the risks. As the Cicero article noted, that was entirely plausible. That was simply that oxymorphone was a more potent drug and that it drove people to abuse it no matter how difficult it was to do so, or that the type of people who abused that drug simply were willing to go through the efforts. So it did not demonstrate that it would have been non-obvious to do what we proposed here, which is to take Bartholomews and heat it subsequently. If Your Honors have any more questions, I'm happy to answer. But I know it's been a long day. I'm happy to cede my time. I don't know where we were in your time, but I guess you've got several. We'll give you three minutes to revise. Thank you, Your Honors. On the period of time, Your Honor, I don't think you could start with Bartholomews. I think you would start with the problem that people were trying to solve, and that was the grave problem of abuse, which began in the early 2000s, many years before Bartholomews. And here, too, it's undisputed. Accord's own experts said this at 5704 to 05, that there was definitely a long-felt but unmet need that was solved here. And I think that answers any questions about the timing. And, in fact, although he suggests that we came up with this just a few months after we visited Grunenthal, we had been working on it for years. And he points to Bartholomews. Grunenthal had Bartholomews. Bartholomews worked there. But they tried 400 different batches, 900 different formulations. When did Purdue have Bartholomews? I'm not the man. Yeah, it visited then. I think it might have been 2005, Your Honor. I forget the exact date. Is it right that your application was filed? It came in several months later, Your Honor. But, again, we weren't building off of what we – Bartholomews, that visit was only one small part of the process. We had been working on this for years, trying many different things. And here you had, you know, which polymer to use, whether to use a polymer or PEO, how to heat it. And that's why Bartholomews didn't help here. He used subsequent compression. The genius here was heating without compression, which is something that a court's own witness said with PEO you'd expect to result in a puddle. I just want to mention the Allot-Abac patents briefly because they are important. This court's prior decision, again, the court indicated that Purdue could avoid an obviousness problem with respect to these patents by claiming the removal of 8A itself, which was the discovery that the district court here itself recognized was a surprisingly important component of the solution, rather than just the end result, coming up with an oxycodone with low levels of 14-hydroxy. So I think it would be surprising and certainly unfortunate for the court today to hold it after Purdue had done what this court and the district court in OxyContin said could avoid an obviousness determination, nevertheless resulted in an obviousness determination. And viewing this against the whole discovery of the problem jurisprudence, this was that Purdue not only discovered the problem, low levels of 14-hydroxy, but the source of the problem, this 8Alpha, which the district court, again, said was surprisingly important. Can I ask, you devote almost your whole brief to the first patent, a very small part to the second. Is there something about the real-world difference between the two patents that differentiates them in terms of impact or something? So the first set, the lower-level patents expire earlier, Your Honor. That's one thing. But frankly, the legal error there is very clear and discreet. We devoted more time to the abuse deterrent because it was a more nuanced analysis with many different errors. I think both are extremely important to this product and to the ingenuity that went into developing these solutions. Thank you, Your Honor. Thank both sides. The case is submitted. That concludes our proceedings.